2019 IL App (3d) 170845

Opinion filed June 12, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| RAYMOND PARKS; CHARLES PARKS; ARLENE PARKS, as Special Representative of the Estate of Robert Parks; GEORGE R. MUELLER; KATHLEEN REASON, Personally and as Special Representative of the Estate of Anna Mueller; DON P. MUELLER; MICHAEL MUELLER; and JAMES MUELLER, | ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois. |
| Plaintiffs-Appellants, | ) ) | Appeal No. 3-17-0845 Circuit No. 12-MR-44 |
| v. | ) ) ) | |
| JAMES D. PARKS, Personally and as the Executor of the James C. Parks Estate and the Successor Trustee of the William Parks Jr. Revocable Living Trust; and JOHN L. PARKS, | ) ) ) ) ) | The Honorable Mark A. VandeWiele, Judge, presiding. |
| Defendants-Appellees. | ) | |

JUSTICE McDADE delivered the judgment of the court, with opinion.
Presiding Justice Schmidt and Justice O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiffs filed a complaint for the ejectment of defendant James D. Parks (James D.), arguing that they are entitled to possession of a farm under the will of Laura Parks (Laura). Both parties filed cross-motions for summary judgment. The trial court denied plaintiffs' motion and partially granted defendants' motion, determining that (1) James D. had possessory rights to the farm through a contractual agreement between William Parks Jr. (Will Jr.) and Laura and the subsequent conveyance of Will Jr.'s interest in the farm and (2) plaintiffs' claim was barred by *laches*. Plaintiffs appealed. We affirm.

¶ 2                            I. BACKGROUND

¶ 3        In a two-step transaction on April 8 and 9, 1943, William Parks Sr. (Will Sr.) effectively conveyed 332 acres of land in Rock Island, Illinois (Parks Farm), which he had previously solely owned, to himself and his wife, Laura Parks, in joint tenancy. The two deeds effecting this conveyance were recorded on April 12, 1943.

¶ 4        The couple had five[1] children: William (Will Jr.); John D.; Robert; Anna; and Donald. Will Jr. had one son, James C. John D. predeceased his parents, leaving three children: John L., Charles, and Raymond. John L. had one son, James D. Donald, who died without children, predeceased Laura.

¶ 5        Sometime during 1946-47, Will Sr. and Laura moved from Parks Farm to a house on another farm. Around the same time, Will Jr. returned from the war, and he and his wife, Edythe, moved into Parks Farm and farmed the land. In 1960, Will Sr. and Laura purchased and moved into a home in Aledo, Illinois. Aside from a brief stay in an

---

[1]The trial court's order states there were four children, but Laura's handwritten correction in "SECTION TWO" of her October 23, 1988, will established there was a fifth child who had also predeceased Laura.

assisted living center, Will Jr. lived and worked on Parks Farm from the time he and Edythe took possession in the mid-1940s until his death in 2002.

¶ 6        In October 1960, Laura wrote separate letters to her other surviving children, Robert, John D., and Anna, informing them that she and Will Sr. intended to sell Parks Farm to Will Jr. Specifically, in her letter to Robert, Laura explained that they were contracting to sell Parks Farm to Will Jr. for $60,000 ($80,000 minus an advancement of Will Jr.'s anticipated $20,000 inheritance from their estates) and Will Jr.'s commitment to co-sign on and to solely pay a mortgage on Parks Farm to help his parents purchase their house in Aledo.

¶ 7        In conformity with the letter, in September 1960, Will Sr., Laura, Will Jr., and Edythe signed a $17,000 mortgage provided by Prudential Insurance Company on Parks Farm. (Will Jr. paid the mortgage in full in May 1978—29 months early.) Will Sr. and Laura moved to the house in Aledo. In February 1961, again in conformity with the letter, Will Jr. entered into an agreement with Will Sr. and Laura to purchase Parks Farm for $60,000. The agreement states, in relevant part:

> "The said Parties of the First Part hereby covenant and agree to convey the said premises above described, or cause the same to be conveyed, to the said Party of the Second Part by a good and sufficient Warranty Deed executed by the Parties of the First Part in due form of law, which Deed shall be delivered to the said Party of the Second Part upon payment being made as hereinafter provided.

\*\*\*

It is agreed by and between the parties hereto that the taxes on said premises for the year 1960 payable in the year 1961 are to be paid by Parties of the Second Part. Possession of said premises shall be delivered to the said Party of the Second Part on or before the 1st day of March 1961.

On his part the said Party of the Second Part agrees to pay to said Parties of the First Part, or the survivors, the sum of Sixty Thousand ($60,000.00) Dollars in the manner following: Assuming by him of real estate mortgage now a lien upon said premises in favor of The Prudential Insurance Company of America in the principal sum of Seventeen Thousand and no/100 ($17,000.00) Dollars, it being understood that said mortgage lien draws interest at the rate of six (6) per cent per annum and the Party of the Second Part is to pay installment of principal and interest due on said mortgage lien March 1st, 1961; and the remainder of the purchase price being the sum of Forty-three Thousand and no/100 ($43,000.00) Dollars, on or before Ten (10) years from the March 1st following the date of the death of the survivor of the Parties of the First Part, together with interest at the rate of four (4) per cent

per annum, payable annually, from March 1st, 1961, to the March 1st following the date of the death of the survivor of the Parties of the First Part, and with interest at the rate of four (4) per cent per annum payable annually, from March 1st two (2) years after the March 1st following the date of the death of the survivor of the Parties of the First Part, it being the intention of the parties hereto that Party of the Second Part shall be relieved from paying any interest for two (2) years immediately following the date of death of the survivor of the Parties of the First Part."

¶ 8      According to the agreement, Will Jr. had an interest payment due annually in the amount of $1720 ($43,000 x 4%), beginning on March 1, 1961. On the last page of the agreement, there were handwritten notes apparently showing interest payments made from 1962 to 1977. There was no notation for the year of 1972 nor for any year after 1977. No deed conveying Parks Farm from Will Sr. and Laura to Will Jr. was ever recorded. The record contains no document from Laura and/or Will Sr. advising Robert, Anna, or John D. that Will Jr. had either completed or defaulted on the purchase of which she had previously advised them. Nor is there any allegation that such information had ever been conveyed to them.

¶ 9      Will Sr. died in March 1985. Laura died four years later in October 1989. If the terms of the purchase agreement had not previously been completed, by its terms, Laura's death fixed the final payment date on the farm as March 1, 2000.

¶ 10 Laura had executed her last will on June 11, 1988—16 months prior to her death. The will made no mention of Parks Farm as part of her estate, made no provision for the receipt and crediting of any payments owing from Will Jr. for Parks Farm, and contained the following residuary clause:

"I give the residue of my estate, excluding any property over which I have a power of appointment at my death, to the following described persons or classes in the following shares:

A. One-third (1/3) thereof to my daughter, ANNA LAURA PARKS MUELLER, if she survives me, and if she does not survive me, then I give such share to the descendants of ANNA LAURA PARKS MUELLER who survive me, *per stirpes*, subject to postponement of possession as provided below.

B. One-third (1/3) thereof to my son, ROBERT D. PARKS, if he survives me, and if he does not survive me, then I give such share per stirpes to the lineal descendants of ROBERT D. PARKS who survive me, subject to postponement of possession as provided below.

C. The remaining one-third (1/3) share thereof I give per stirpes to the lineal descendants of my deceased son, JOHN D. PARKS, who survive me, subject to postponement of possession as provided below; provided,

however, out of this share I give the sum of Five Thousand and no/100ths ($5,000.00) Dollars to my daughter-in-law, PAULINE B. PARKS, if she survives me, which sum shall, to the extent possible, be first paid her before any distribution to the descendants of JOHN D. PARKS.

D. I am not unmindful of my son, WILL PARKS, JR., but feeling that I have previously benefited him, I intentionally make no provisions for him under this will."

Laura specifically bequeathed the only real property identified in her will—her Aledo home—to Anna and her husband, Lawrence Mueller. If Anna or Lawrence predeceased Laura, the Aledo home would become a part of the estate's residue.

¶ 11 Kathleen Reason, Laura's granddaughter and the executor of her estate, filed an inventory listing of Laura's real property, personal property, and causes of action in July 1990. Six months later, Reason signed a final account and report and plan of distribution. A notice of hearing of the final account and report was given to Anna, Robert, Will Jr., John D.'s widow (Pauline Parks), and John D.'s three children (Charles, Raymond, and John L.) and, without objection, the court approved the final account and report and closed Laura's estate. Anna, Robert, Raymond, John L., Charles, and Pauline signed a receipt on distribution stating that they had received "100% of the full and final distributable share" of the estate. Neither Parks Farm nor a still pending purchase agreement was listed as a part of Laura's assets either in her will or during the probate proceedings.

¶ 12    In February 1993, Will Jr. created a revocable trust identifying himself as grantor and trustee. The trust agreement states, in relevant part:

> "Section 4.03. Gift of Real Estate. If my grandnephew, James D. Parks, survives me, I give him all of my farm real estate *which I currently own* and is described as Item 1 of Schedule A attached (hereinafter referred to as 'Property') subject to two conditions: (1) that my son, James C. Parks, if he survives me, shall have the absolute right to reside and otherwise occupy the farm residence, for a period not to exceed six months following my death, without rent or charge, in order to permit him to remove his personal property or any other personal effects given to him under this trust; and (2) that he shall pay each year to my son, James C. Parks, for so long as my son lives, an amount equal to seventy-five percent (75%) of the annual fair market value cash rent for comparable property, as agreed to by my son and James D. Parks (or his successor in interest)." (Emphasis added.)

¶ 13    Will Jr. conveyed "all right, title, and interest" in Parks Farm to the trust by quitclaim deed.[2] From 1992 to 2003, annual real estate tax bills had been mailed to Will Jr. and the Rock Island County Treasurer's Office records showed that the taxes for those years had been paid out of Will Jr. and James C.'s joint checking account at Reynolds

---

[2]Plaintiffs suggest that Will Jr.'s use of a quitclaim deed evidences an implicit concession that he knew he did not actually own Parks Farm.

State Bank. During this time, Will Jr. had lived on and cultivated the farm. In 2000, Will Jr. leased the farm to a tenant farmer but continued to live on the farm with his son James C. until Will Jr. died in May 2002. In January 2005, the trust, by trustee's deed, conveyed Will Jr.'s interest in Parks Farm to James D. and that deed was recorded. James D. received tax bills beginning in 2004. James C. paid the tax bills on behalf of James D. from 2003 until 2011 when James C. died. James D. made the final tax payment for the 2010 tax year in November 2011.

¶ 14    In December 2011, Charles, James D.'s uncle, received a letter from his attorneys that prompted him to inquire about his possible ownership interest in Parks Farm. Charles believed that Will Jr. had quitclaimed Parks Farm to his revocable trust, but when he and his daughter, Paula, checked at the Rock Island County Recorder's Office, they learned no such deed had been recorded. In January 2012, following Charles's discovery, plaintiffs filed a complaint, claiming title to Parks Farm under Laura's will and seeking recovery of all sums and benefits accruing to James D. and to Will Jr.'s trust through the conveyance of Parks Farm. The plaintiffs amended their complaint to add a claim for the ejectment of James D. from the property. Defendants responded, claiming four affirmative defenses: (1) 20-year adverse possession, (2) 7-year adverse possession with payment of taxes, (3) estoppel, and (4) *laches*. Defendants filed a motion for summary judgment, which the trial court initially granted. Plaintiffs sought reconsideration and the trial court granted the motion and reversed its earlier summary judgment ruling. Defendant James D. filed an amended motion for summary judgment, which the trial court denied, and the litigation proceeded.

¶ 15    After discovery was completed, both parties filed cross-motions for summary judgment. The court[3] denied plaintiffs' motion and partially granted that of defendants. Specifically, the trial court determined that defendant James D. had possessory rights to the land, originating with the contract for Will Jr. to purchase Parks Farm from his parents and that there was no evidence that plaintiffs (or their parents) had followed statutory procedure requiring a contract seller to notify a purchaser of any defaults in the contract and give the purchaser at least 30 days to cure the default. The court also held that plaintiffs failed to perfect their own title because there was no deed transferring Laura's title to plaintiffs and the farm was not included in the inventory of the estate.

¶ 16    The court further found that plaintiffs' claim was barred by *laches* because (1) Robert had knowledge that Laura and Will Sr. were contracting with Will Jr. for the purchase of the farm and plaintiffs had notice from public record and (2) defendant was prejudiced because (a) Will Jr. and James C., both now deceased, could have testified to pertinent information about the contract and farm, (b) after several years, Will Jr.'s attorney had destroyed his files, (c) James D. would have no reason to save cancelled checks and receipts as the farm was not listed as part of the inventory in Laura's probate, and (d) plaintiffs had waited just under 35 years (15 years after the 20-year limitations period) to file their claim. The court rejected defendant's *res judicata*, adverse possession, and color of title defenses. Plaintiffs appealed.

---

[3]At this point in the litigation, injuries sustained in an accident precluded the presiding judge's timely resolution of the parties' pending motions, and a new judge was appointed to decide the summary judgment motions. Both parties indicated their satisfaction with having the newly assigned judge make the decision.

¶ 17                                    II. ANALYSIS

¶ 18        In this appeal, plaintiffs challenge the trial court's denial of their motion for summary judgment and the partial grant of defendants' motion for summary judgment. They contend that they have the *prima facie* title to the Parks Farm necessary to bring a claim for ejectment against defendants under section 6-109 of the Code of Civil Procedure (735 ILCS 5/6-109 (West 2016)). Plaintiffs also argue that (1) their claim is not barred by *laches*, (2) defendants did not acquire title of the farm through 20-year adverse possession or under color of title, and (3) their claim is not barred by *res judicata*.

¶ 19        When parties file cross-motions for summary judgment, they initially agree that only a question of law is involved and ask the court to decide the legal issues. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. "However, the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment." *Id.* Summary judgment should be granted by the circuit court only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2016). An appellate court is similarly constrained because our standard of review is *de novo*. *Seymour v. Collins*, 2015 IL 118432, ¶ 42. The parties here do not assert, and we do not find, that there is a genuine issue as to any material fact.

¶ 20        Pending in this appeal is plaintiffs' challenge to the circuit court's decision denying their motion for summary judgment and granting partial summary judgment in

favor of defendants. Although some of defendants' claims in their summary judgment motion were denied, no cross appeal has been filed. Thus, we review this case to determine whether the prevailing moving party was clearly entitled to judgment as a matter of law.

¶ 21    Because defendants argue that plaintiffs are barred from bringing their ejectment claim, we begin our analysis addressing their defenses. Defendants allege plaintiffs' ejectment claim is barred by *laches*. They contend that plaintiffs were not diligent in discovering their claimed interest in the farm because (1) although plaintiffs received a letter from Laura that she was selling the farm to Will Jr., they failed to inquire about whether the contract had been satisfied and (2) Reason failed to investigate whether Laura had retained ownership in Parks Farm after her death. Defendants also claim that they were prejudiced by the delay because (1) Will Jr. was not available to testify about his rights and interest in the farm and (2) James D. incurred risks and obligations by paying taxes and insurance on the farm.

¶ 22    Citing this court's opinion in *Amgro, Inc. v. Johnson*, 71 Ill. App. 3d 485, 489 (1979), plaintiffs argue that facts known to them must have been such to raise suspicion and cause inquiry. They allege that their knowledge that Will Sr. and Laura entered into a contract with Will Jr. to purchase the farm and that Will Jr. remained in possession of the farm did not raise suspicion or cause inquiry to investigate rights to title. Rather, they claim that they did not discover their claim until they received notice of James C.'s probate estate in December 2011. Furthermore, plaintiffs contend that defendants were not prejudiced because (1) although Will Jr. passed away, Will Jr. and James D. had an opportunity to establish title to the land but never did, and (2) James D. did not incur

risks and expenses as James C., not James D., paid the majority of the farm expenses, possessed the farm, and retained profits from the farm. Lastly, plaintiffs claim that defendants cannot raise the defense of *laches* unless their ejectment claim is also barred by adverse possession.

¶ 23    *Laches* is an equitable doctrine that precludes the assertion of a claim by a litigant whose unreasonable delay in raising that claim has prejudiced the opposing party. *Tully v. State*, 143 Ill. 2d 425, 432 (1991). "The doctrine is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party." *Id.* To prove *laches*, defendants must show (1) lack of diligence by the party asserting the claim and (2) prejudice to the opposing party resulting from the delay. *Id.* "The test is not what the appellant knows, but what he might have known by the use of the means of information within his reach with the vigilance the law requires of him." *Pyle v. Ferrell*, 12 Ill. 2d 547, 554 (1958).

¶ 24    Defendants cite *Pyle* to support their argument. In *Pyle*, the plaintiff acquired title to a mineral estate through his father's will. *Id.* at 549-50. He learned about his inheritance in 1932 when his mother died. *Id.* at 550. He had lived in California until 1946 when he moved back to Illinois. *Id.* Although he moved 35 miles away from the land, he did not visit or utilize the estate. *Id.* In 1936, the estate was sold for delinquent taxes to Haggie and Bessie Ferrell. *Id.* at 551. Haggie subsequently died. *Id.* In 1954, the plaintiff was notified that the estate had been sold and filed a claim to quiet title. *Id.* at 550.

¶ 25    The supreme court determined that the plaintiff's claim was barred by *laches*. *Id.* at 555-56. It reasoned that, considering the plaintiff's close proximity to the land and the

public records concerning the land, "ordinary prudence would suggest he make inquiry into the status of his interest." *Id.* at 554. However, he failed to investigate for eight years after he moved closer to the land. *Id.* Moreover, the defendant incurred risks and obligations related to the lease of the land for oil and gas and paid taxes on the land for 20 consecutive years. *Id.* at 555. The court further explained that the loss of decedent's testimony, which would have been important to the issue of possession under the tax deed, was another factor to consider in granting relief to the defendant. *Id.*

¶ 26    Here, plaintiffs did not diligently assert their putative claim against defendants. The evidence shows that plaintiffs knew or should have known about their interest in the farm decades before this action was filed. In 1960, Robert, John D., and Anna received letters from Laura informing them that she and Will Sr. intended to sell the farm to Will Jr. She further told at least Robert how they calculated the purchase price, including the offset of Will Jr.'s anticipated share of their estate. In 1989, Laura, the last surviving spouse, died. She did not list the farm or an incompleted purchase agreement as estate assets; nor did she leave any information about or instructions for completing any still-pending payments for purchase of the farm. She did, however, include a specific reference to Will Jr.'s "previous[ ] benefit[ ]" (the offset of his inheritance against the purchase price for Parks Farm) when explaining why he had no inheritance under the will. At this point, plaintiffs had a reminder of the purchase and an opportunity to inquire of Will Jr. or to search the public records for information about the status of their interest, if any, in the farm. However, Reason, the executor of Laura's estate, undertook no inquiry and did not include the farm or anything related to it in either the inventory listing or the final account and report. After the court's approval of the final account and report,

- 14 -

it closed the estate. There was no discussion about the farm during the probate proceeding.

¶ 27 Plaintiffs argue that they did not know about their interest in the farm because they believed Will Jr. owned the farm. However, Laura's 1960 letters only stated her intent to sell the farm. There is no evidence that any of Will Jr.'s siblings asked any questions of him or their mother about the status of the sale before her death or made any inquiry of him or search of the records after she died. Nor was there any evidence demonstrating that the contractual agreement had or had not been completed when she died. Absent such evidence, plaintiffs should have known to inquire during the probate proceeding about the status of any interest they might still have in the farm. Fifty-two years without any inquiry or action about the ownership of the farm seems to us to constitute an unreasonable delay.

¶ 28 Moreover, defendant was demonstrably prejudiced by this delay. Evidence that was not obtained or retained during the 29 years between the execution of the purchase agreement and Laura's death or during the 23 years between Laura's death and the filing of this action left many questions that, if timely answered, would have assisted this court in determining who actually had title to the farm. As circumstances stand, however, there is no direct evidence about the completion of the contractual agreement. Laura went to her grave, as did Will Sr., without shedding any light on the progress of Will Jr.'s purchase. Will Jr., a potential witness in this suit, died in 2002. After several years, his attorney destroyed his files. James C., another potential witness, died without being questioned, and the parties have not provided any evidence related to his probate or any answers to fundamental questions that would assist this court. See *id.* ("the rule of *laches*

is particularly applicable where the difficulty of doing entire justice arises through the death of parties to the transaction complained of").

¶ 29 In addition, plaintiffs have provided no evidence of any involvement with or interest in the farm. The record shows that Will Jr. cultivated the farm, leased the farm to a tenant, and paid taxes until his death. Afterward, James C. continued to live on the farm and pay taxes until his death. See *id.* ("a party is guilty of *laches* which ordinarily bars the enforcement of his right where he remains passive while an adverse claimant incurs risk, enters into obligations, or makes expenditures for improvements or taxes"). It bears noting that Will Jr.'s siblings—Robert, John D., and Anna—have also died and are unavailable to testify about any questions they may have asked or information they may have learned from their mother or father or from Will Jr. about the progress, or lack thereof, on the purchase agreement.

¶ 30 Plaintiffs contend that the residual clause in Laura's will gave them title to the farm. We disagree. Laura gave her Aledo home to Anna and Lawrence and included it in the residual of her estate if Anna and Lawrence predeceased her, but there is no mention of the farm or any other real estate in the will. Furthermore, plaintiffs did not include the farm in the final accounting or the plan of distribution. In fact, plaintiffs signed receipts on distribution stating that each had received 100% of his or her share of the estate and the estate has never been reopened to administer any unsettled assets. See 755 ILCS 5/24-9 (West 2016).

¶ 31 Relying on *Illinois Central R.R. Co. v. Cavins*, 238 Ill. 380 (1909), plaintiffs allege that defendants cannot assert *laches* unless they establish that plaintiffs' claim is barred under adverse possession. Plaintiffs misconstrue the ruling in *Cavins*, which

- 16 -

established that *laches* cannot bar an ejectment claim unless plaintiff's delay in bringing the claim is barred under the *statute of limitations*. *Id.* at 385. Our supreme court in *Thomas v. Chapin*, 274 Ill. 95, 102 (1916), in which the appellant argued that the appellee was barred by *laches* from asserting an interest in land, explained that:

> "In fixing the period in which rights and claims will be barred by *laches*[,] equity follows the law, and, as a general rule, where the period of limitation is fixed by statute, courts of equity will by analogy adopt the same period. If appellee's rights are not barred by the Statute of Limitations, she is not barred by *laches*, unless, in addition to mere delay, there would be something in her conduct or the circumstances that would make it inequitable to permit her to assert her title."

In other words, mere delay does not bar a plaintiff from bringing a claim unless the statutory period has ended. *Brunotte v. DeWitt*, 360 Ill. 518, 534 (1935). "To avail themselves of the defense of *laches* within the statutory limitation period it was incumbent upon the defendants to show that the complainant's delay in instituting this proceeding was accompanied by some other element rendering it inequitable for her to assert her title." *Id.*

¶ 32      Section 13-101 of the Code of Civil Procedure (735 ILCS 5/13-101 (West 2016)) states that a person must commence an action for the recovery of lands within 20 years after his right to bring an action accrues. This 20-year limitations period applies to ejectment actions. *Rosenthal v. City of Crystal Lake*, 171 Ill. App. 3d 428, 440 (1988).

Plaintiffs initially learned about their interest in the farm when Laura sent the 1960 letter expressing her intent to sell the farm to Will Jr., thereby tacitly acknowledging their future interest if she and Will Sr. retained the farm. Plaintiffs had the opportunity to inquire of Laura or Will Jr. about the status of their interest at any time up to her death or at any time prior to Will Jr's. death. It was, however, during probate, after Laura died without listing the farm in her will and without any evidence that the contract had or had not been completed, that their duty to inquire about any interest they might have in the property arose, creating a cause of action.

> "Under the discovery rule, the limitations period does not begin to run until the plaintiff knows or reasonably should have known of its injury and that it was wrongly caused. [Citation.] At the point the injured person knows or should have known that his or her injury was 'wrongly caused,' the injured person possesses sufficient information concerning his injury and the cause of his injury to put a reasonable person on notice to make additional inquiries." See *RVP, LLC v. Advantage Insurance Services, Inc.*, 2017 IL App (3d) 160276, ¶ 30.

Nonetheless, plaintiffs waited 23 years to file this action. As the trial court ruled in this case, plaintiffs' claim was filed after the limitations period; thus, the claim may also be barred by *laches*. See *Miller v. Siwicki*, 8 Ill. 2d 362, 367 (1956) (finding that plaintiff's ejectment claim was barred by *laches* because, *inter alia*, "injustice would result from the fact that the original judgment has been barred by limitations and can no longer be

revived"). Even if plaintiffs' claim had not been barred by the 20-year limitations period, we believe the evidence shows that defendant was fatally prejudiced by plaintiffs' delay. Therefore, we hold that plaintiffs' ejectment claim is barred by *laches* and that the trial court did not err in so finding. We need not address defendant's remaining affirmative defenses (two forms of adverse possession and estoppel) as this issue is dispositive of this case. Moreover, defendants, not plaintiffs, lost below on the adverse possession issues. No cross-appeal was filed. See *Kubicheck v. Traina*, 2013 IL App (3d) 110157, ¶ 42 (an appellee who has not filed a cross-appeal cannot seek to modify a portion of the trial court's order to secure affirmative relief). Nor do those issues appear to be integral to plaintiffs' appeal because plaintiffs only challenge the trial court's finding of *laches* and the denial of their ejectment claim. Those affirmative defenses are therefore not before us.

¶ 33        We also find that plaintiffs' ejectment argument fails on statutory grounds because they never had possession of the farm. In an ejectment action, the plaintiff must show that (1) he had possession of the subject premises after obtaining legal title, (2) the defendant subsequently took possession of the premises, and (3) the defendant unlawfully withholds possession from the plaintiff. 735 ILCS 5/6-109 (West 2016). Will Jr. and, later, James C. lived on, cultivated, and leased the farm from 1946 or 1947, until each one died. There is no evidence that plaintiffs ever had any involvement with the farm during these years. Even if plaintiffs claimed they had possession of the property through Laura as predecessor in title (see *Department of Conservation v. Fairless*, 273 Ill. App. 3d 705, 712 (1995)), there is no evidence that defendants "unlawfully withheld[ ] the possession" of the farm from her. Laura and Will Sr. entered into an agreement with Will

- 19 -

Jr. in which Will Jr. was given possession and potential for ownership of the land beginning on March 1, 1961. Although the trial court found that Will Jr. breached the contract when he did not pay taxes for the year of 1977, there is no evidence that Laura or Will Sr. aborted the contract or denied Will Jr. continued possession of the farm. See *Mapes v. Vandalia R.R. Co.*, 238 Ill. 142, 144 (1909) ("Where possession of land has been acquired by the assent of the owner and has been long continued, the holding of possession may not be wrongful until demand of possession has been made."). Therefore, we find that plaintiffs did not meet the elements necessary to show they have a cause of action for ejectment under the statute.

¶ 34                                    III. CONCLUSION

¶ 35          The judgment of the circuit court of Rock Island County is affirmed.

¶ 36          Affirmed.